IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

BARRY LAMON,

     Plaintiff,               No. CIV S-06-0156 GEB KJM P

   vs.

DIRECTOR, CALIFORNIA
DEPARTMENT OF CORRECTIONS,   ORDER AND
et al.,
     Defendants.          FINDINGS AND RECOMMENDATIONS

_____/

        Plaintiff is a state prison inmate proceeding pro se with a civil rights action under

42 U.S.C. § 1983.  The court ordered service of his amended complaint on defendants Downing,

Ellis, Johnson, Lorusso, Parks, Moghaddas, Walker and Paizis on the following claims:  (1) from

October 2003 through July 2004, defendants Downing, Johnson, Paizis and Moghaddas

prescribed an antiviral drug called Amantadine but told plaintiff it was an anti-depressant, which

he would have to take if he wanted to be released from psychiatric segregation, Amended

Complaint (Am. Compl.) ¶ 32; (2) defendant Walker retaliated against plaintiff for filing a civil

action by trying to have plaintiff killed by Bloodline gang members, id. ¶ 33; and (3) defendants

Ellis, Parks and Lorusso used pepper spray against plaintiff, id. ¶ 40.  Defendants, all of whom

work or worked for the California Department of Corrections and Rehabilitation (CDCR), have

/////

1

1  moved for summary judgment.  Plaintiff has sought permission to exceed the filing limits for his

2  opposition to the motion.  Defendants have filed a reply.

3  I.  Standards For Summary Judgment

4          Summary judgment is appropriate when it is demonstrated that there exists "no

5  genuine issue as to any material fact and that the moving party is entitled to a judgment as a

6  matter of law."  Fed. R. Civ. P. 56(c).

7          Under summary judgment practice, the moving party

8          always bears the initial responsibility of informing the district court
           of the basis for its motion, and identifying those portions of "the
9          pleadings, depositions, answers to interrogatories, and admissions
           on file, together with the affidavits, if any," which it believes
10         demonstrate the absence of a genuine issue of material fact.

11  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  "[W]here the

12  nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary

13  judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers

14  to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered,

15  after adequate time for discovery and upon motion, against a party who fails to make a showing

16  sufficient to establish the existence of an element essential to that party's case, and on which that

17  party will bear the burden of proof at trial.  See id. at 322.  "[A] complete failure of proof

18  concerning an essential element of the nonmoving party's case necessarily renders all other facts

19  immaterial."  Id.  In such a circumstance, summary judgment should be granted, "so long as

20  whatever is before the district court demonstrates that the standard for entry of summary

21  judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323.

22          If the moving party meets its initial responsibility, the burden then shifts to the

23  opposing party to establish that a genuine issue as to any material fact actually does exist.  See

24  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

25  establish the existence of this factual dispute, the opposing party may not rely upon the

26  allegations or denials of its pleadings but is required to tender evidence of specific facts in the

2

form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson, 477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken /////

as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

On December 6, 2007, the court advised plaintiff of the requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure. See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc), and Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

II. Evidentiary Issues

Defendants have objected to some of the evidence plaintiff has offered as exhibits to his opposition.

A. Plaintiff's Declaration

Defendants object to plaintiff's five page declaration on a number of grounds, ranging from relevancy to lack of foundation. The declaration suffers from a more basic problem: it is not signed. See Docket No. 191-3 at 5. The court cannot consider it in opposition to the motion for summary judgment. United States v. Ritchie, 342 F.3d 903, 900 (9th Cir. 2003); Woloszyn v. County of Lawrence, 396 F.3d 313, 323 (3d Cir. 2005); Fed. R. Civ. P. 56(e). However, plaintiff's opposition to the motion for summary judgment, including his account of the disputed and undisputed facts, is signed under the penalty of perjury, as is the amended complaint; the court will consider the contents of these documents to the extent they are based on plaintiff's personal knowledge, are not conclusory, and do not run afoul of the Federal Rules of Evidence.

B. Declaration of Lenton Hall

Plaintiff has submitted the declaration of inmate Lenton Hall, who claims to have been an "eye-and-ear-witness" to several of the events alleged in the complaint. Opposition (Opp'n), Ex. 28 ¶ 8. Defendants have objected to the declaration on a number of grounds.

In paragraphs two, three and four, Hall describes his own experiences with allegedly poisoned food at California State Prison-Sacramento and petitioner's conversations

4

1   with Hall about being poisoned as well.  Plaintiff made such claims in his amended complaint,

2   but the court did not find these appropriate for service.  See Order (Docket No. 44).  This portion

3   of the declaration is not relevant to the claims before the court.

4          In paragraph five, Hall avers he was housed two cells away from plaintiff on

5   November 21, 2004, when defendant Parks used pepper spray on plaintiff, and asserts that

6   plaintiff did not throw a tray at Parks and that Parks did not issue any verbal commands.

7   Because Hall does not explain whether his cell was across from or next to plaintiff's, the court

8   cannot tell whether he could see the incident.  Shakur v. Schriro, 514 F.3d 878, 890 (9th Cir.

9   2008) ("[c]onclusory affidavits that do not affirmatively show personal knowledge of specific

10  facts are insufficient."); De La Torre v. Merck Enterprises, 540 F.Supp.2d 1066, 1075 (D. Az.

11  2008) ("a witness has personal knowledge only when testifying about events perceived through

12  the physical senses or when testifying about opinions rationally based on personal observation

13  and experience").  There is a sufficient foundation, however, for Hall's auditory perceptions.

14         In paragraph six, Hall claims that correctional officers were angry at plaintiff and

15  began a concerted effort to punish plaintiff.  Nothing in the averments shows Hall's personal

16  knowledge of what he describes in this paragraph; it will be disregarded.

17         In paragraph seven, Hall says that after he threw urine on defendant Ellis, Ellis

18  retaliated against him "by needlessly pepper spraying me and falsely justifying his actions by

19  saying that I had taken my food-port hostage and that he sprayed me to regain control of the

20  port."  Although these allegations of Hall's are similar to the allegations of the complaint, they

21  are not sufficiently similar to render Hall's description relevant.  Compare Treece v. Hochstetler,

22  213 F.3d 360, 364 (7th Cir. 2000).

23         Paragraphs eight and nine – listing other inmates who witnessed incidents with

24  plaintiff and professed a willingness to come to court – have no connection to the disputed facts

25  in this case.

26  /////

C.  Declaration of G. Nicholls

The Nicholls declaration was submitted in connection with the court's request for information on plaintiff's claimed inability to make copies from his central file.  See Opp'n, Ex. 3; see also Docket No. 161.  Defendants argue that plaintiff's reliance on it to authenticate various grievances is improper.  If that is the purpose plaintiff intends, it is unavailing, for the declaration does not establish the foundation for the admission of business records.  Clark v. City of Los Angeles, 650 F.2d 1033, 1036 (9th Cir. 1981).

D.  Unrelated Grievances

A portion of Exhibit 3, as well as Exhibits 7 and 14, are grievances relating to incidents not before this court and are not authenticated.  They are not admissible on summary judgment.  Orr v. Bank of America, NT & SA, 285 F.3d 764, 773 (9th Cir. 2002).

E.  Movement History

Exhibit 4 documents plaintiff's movement history.  While it may be authenticated by its distinctive characteristics, Fed. R. Evid. 901(4), plaintiff has not laid a foundation for a non-hearsay use.  Compare Fed. R. Evid. 803(6).

F.  Grievance History

Exhibit 5 is a print-out of plaintiff's grievance history, which plaintiff offers to show that a correctional officer not a party to this action asked him to withdraw a grievance about his placement on B Facility.  It is not relevant.

G.  Ad Seg Placement Form

Exhibit 11 is a form documenting plaintiff's placement in Administrative Segregation (Ad Seg) on February 19, 2004.  Defendants object that the form is not authenticated and is being offered for a hearsay purpose – to show that plaintiff informed authorities he was in danger from members of the Bloods.  The court relies on appearance, contents and substance in finding it authentic: each page of the printed CDCR form contains plaintiff's name and CDCR number.  Plaintiff's statements – that he felt threatened by the Bloodline members on B Facility –

6

would be admissible at trial even if they are not in an admissible form in the exhibit.

Defendants' objection is overruled.  Fraser v. Goodale, 342 F.3d 1032, 1036-37 (9th Cir. 2003).

       H.  Rules Violations Hearing Records

            Exhibits 16, 21, 22, 25 and 26 are reports of proceedings on rules violations

hearings.  Plaintiff has not laid the foundation for any non-hearsay use of the statements

contained in these reports except for those statements of the defendants that may be deemed to be

admissions of party opponents or plaintiff's own statements.  Fed. R. Evid. 801(d)(2); Fraser, 342

F.3d at 1036-37.

       I.  Mail Record

            Plaintiff offers Exhibit 20 to show that he sent letters of complaint that he says

prompted retaliatory actions by Parks, Lorusso and Ellis.  This record is not relevant; as

explained below, plaintiff has failed to demonstrate that these defendants were aware of

plaintiff's complaints.

       J.  Discovery Responses

            Exhibit 23 is a copy of interrogatories plaintiff sent to defendant Ellis.  The fact

that plaintiff sent interrogatories is not relevant to this action.

            Exhibit 27 is one page, apparently from defendant Ellis's response to plaintiff's

first set of interrogatories.  There is sufficient evidence in the record to authenticate it.  See

Docket No. 60-4 at 2-13.  Moreover, defendant Ellis's answers are admissions of a party

opponent.  Fed. R. Evid. 801(d)(2); Sea Star Line, LLC v. Emerald Equipment Leasing, Inc., 648

F.Supp.2d 626, 639 (D. Del. 2009).  Defendants' objection to Exhibit 27 is overruled.

       K.  Other Litigation

            Exhibit 8 is the docket from Lamon v. Pliler, 03-423 FCD CMK P, filed in this

court; plaintiff alleges that this lawsuit prompted defendant Walker's retaliatory actions.  The

court may take judicial notice of the existence of the docket and the fact of the case's filing.

Defendants' objection is overruled.

1    Exhibits 19, 24, 29 and 30 are documents filed in other lawsuits and a letter from

2    a lawyer to plaintiff.  They are not relevant to this action.

3    III.  Defendants Downing, Johnson, Paizis And Moghaddas

4    Defendants Downing, Johnson and Paizis were psychiatrists, and Moghaddas a

5    psychologist, at California State Prison-Folsom.  Am. Compl. ¶¶ 2, 32.  Plaintiff has been

6    diagnosed with schizoaffective disorder.  Opp'n, Ex. 2 at 54;[1]  Defs.' Motion For Summary

7    Judgment (MSJ), Ex. C, Declaration of R. Johnson (Johnson Decl.) ¶¶ 3-4.  Plaintiff was

8    prescribed Risperidone, an anti-psychotic drug.  Johnson Decl. ¶ 6; Opp'n, Ex. 18 at 43.

9    One side effect of Risperidone is extra-pyramidal symptoms – involuntary

10   movements –, which can become permanent and disabling if not treated.  Johnson Decl. ¶¶ 6-7.

11   Amantadine has been approved for the treatment of drug-induced Extra Peri-Medical System

12   (EPS); it is both an anti-cholinergic and an anti-viral drug.  Id. ¶ 8; Lodg. Doc., Ex. E (Docket

13   No. 126-7; Moghaddas' Interrogatory Responses) ¶¶ 4-5, 18.  Plaintiff denies that he has ever

14   suffered from EPS and has produced his medical records from the time when Amantadine was

15   first prescribed that do not mention any symptoms of EPS.  Opp'n at 13 ¶ 35 & Ex. 17.[2]

16   Defendants have produced no records or other evidence showing that petitioner was diagnosed

17   with EPS.  Nevertheless, the record shows that Amantadine was prescribed for plaintiff.

18   A "Psychiatric Medications Informed Consent" signed by plaintiff on June 9,

19   2003 notes that defendant Downing had "recommended the medication Amantadine for the

20

21   _____

     [1]  The court relies on the pagination assigned by its ECF system when referring to
     plaintiff's filings other than the amended complaint, for which paragraph references are used.

22

23   [2]  Defendants argue that plaintiff's assertion is a medical opinion, which he is not
     competent to give, and is not supported by admissible evidence.  Reply at 5-7.  Plaintiff may
     describe any symptoms or lack thereof but may not offer a self-diagnosis.  EEOC v. Autozone,

24   Inc., 631 F.Supp.2d 1076, 1080 (C.D. Ill. 2009); Hrichak v. Pion, 498 F.Supp.2d 380, 382 (D.
     Me. 2007); Lamon v. Tilton, 2008 WL 5395746 (E.D. Cal. 2008); Fed. R. Evid. 701.  The court

25   construes plaintiff's assertions to refer to his symptoms rather than to a diagnosis.  However, the
     court will not consider plaintiff's contention that he does not have schizoaffective disorder or

26   delusions, for these are diagnoses he is not qualified to make.  See, e.g., Opp'n at 12 ¶ 31.

1   treatment of my mental problems."  Mot. to Hold Hearing In Abeyance (Docket No.164) at 24.

2   Among the potential side effects is tardive dyskinesia, which was defined on the form as

3   involuntary movements of the face, mouth, hands and feet.  Id.  In addition, when plaintiff was

4   discharged from the Correctional Treatment Center (CTC) in July 2004, defendant Paizis

5   included Amantadine as one of plaintiff's discharge medications and identified it as an anti-

6   depressant.  Opp'n, Ex. 18 at 43.  However, a discharge summary signed by defendant Johnson

7   and plaintiff on June 12, 2003, notes that Amantadine was prescribed for EPS.  Reply, Ex. C.

8           According to plaintiff, when he was discharged from Ad Seg, defendants told him

9   if he stopped taking Amantadine, he would be returned to Ad Seg.  Opp'n at 13-14 ¶ 36; Lodg.

10   Doc., Ex. E (Docket No. 126-7; Moghaddas' Interrogatory Response) ¶ 15 ("It is standard

11   practice to require a mentally ill inmate to remain medication compliant.").

12       A.  Amantadine Prescription

13           In Estelle v. Gamble, 429 U.S. 97, 106 (1976), the Supreme Court held that

14   inadequate medical care did not constitute cruel and unusual punishment cognizable under

15   section 1983 unless the mistreatment rose to the level of "deliberate indifference to serious

16   medical needs."

17           In the Ninth Circuit, the test for deliberate indifference consists of
        two parts. First, the plaintiff must show a serious medical need by
18           demonstrating that failure to treat a prisoner's condition could
        result in further significant injury or the 'unnecessary and wanton
19           infliction of pain.'' Second, the plaintiff must show the defendant's
        response to the need was deliberately indifferent.  This second
20           prong-defendant's response to the need was deliberately
        indifferent-is satisfied by showing (a) a purposeful act or failure to
21           respond to a prisoner's pain or possible medical need and (b) harm
        caused by the indifference. Indifference may appear when prison
22           officials deny, delay or intentionally interfere with medical
        treatment, or it may be shown by the way in which prison
23           physicians provide medical care.

24   Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal citations & quotations omitted); see

25   also McGuckin v. Smith, 974 F.2d 1050, 1060 (9th Cir. 1992), overruled in part on other

26   grounds, WMX Technologies, Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997).

1    A showing of merely inadvertent or even negligent medical care is not enough to

2 establish a constitutional violation.  Estelle, 429 U.S. at 105-06; Frost v. Agnos, 152 F.3d 1124,

3 1130 (9th Cir. 1998).  A difference of opinion about the proper course of treatment is not

4 deliberate indifference nor does a dispute between a prisoner and prison officials over the

5 necessity for or extent of medical treatment amount to a constitutional violation.  See, e.g.,

6 Toguchi v. Chung, 391 F.3d 1051, 1058 (9th Cir. 2004).

7    It is undisputed that Amantadine is prescribed to combat drug-induced extra-

8 pyramidal symptoms, that Risperidone can cause EPS, and that plaintiff was taking Risperidone.

9 Even accepting plaintiff's assertion that he was not suffering from EPS, the court cannot find

10 defendants' prescribing a drug to combat a likely and serious side effect of Risperidone was

11 designed to cause rather than to forestall harm.  Moreover, plaintiff has not presented any

12 evidence showing that the administration of Amantadine in fact harmed him.  There was no

13 Eighth Amendment violation.  Herndon v. Whitworth, 924 F.Supp. 1171, 1173 (N.D. Ga. 1995)

14 (administration of wrong drug did not state an Eighth Amendment claim even when it caused

15 inmate to have seizures); compare Battle v. Central State Hospital, 898 F.2d 126, 129 (11th Cir.

16 1990) ("excessive and unnecessary" administration of medicine may state an Eighth Amendment

17 claim).

18    If plaintiff's Eighth Amendment claim is based on the alleged misinformation

19 about Amantadine – that a doctor's note indicates it was prescribed to treat his mental illness

20 rather than to treat a side effect of another drug – he still does not succeed.  Plaintiff's own

21 evidence shows he has been diagnosed with schizoaffective disorder, bipolar disorder,

22 adjustment disorder; the prescription of something identified as an anti-depressant, and

23 administered for a legitimate purpose without negative side effects, does not demonstrate

24 deliberate indifference in the face of his psychiatric diagnosis.  Opp'n, Ex. 2 at 54, 56, 62.

25    To the extent plaintiff is raising a due process claim, he fares no better.  An

26 inmate retains a substantive due process right to bodily integrity, which includes the protection

10

against the involuntary administration of medication that is not medically appropriate.  Johnson
v. Meltzer, 134 F.3d 1393, 1397 (9th Cir. 1998); Hendon v. Ramsey, 528 F.Supp.2d 1058, 1066
(S.D. Cal. 2007).  The undisputed facts show that plaintiff consented to take Amantadine.  Mot.
to Hold Hearing In Abeyance (Docket No. 164) at 24.  Even if plaintiff believed when he
consented that the medication was being prescribed for depression rather than for EPS, the
discharge summary prepared three days later and signed by plaintiff identifies the proper purpose
for the Amantadine prescription.  Reply, Ex. C.  Nothing in the record shows that plaintiff
revoked his consent when he was told that Amantadine was prescribed for EPS.  Moreover, in a
"CTC Admit Note" dated February 18, 2004, defendant Johnson records that plaintiff "wants
previous meds back – changed 3 days ago;" those "meds" included Amantadine.  Opp'n, Ex. 10
at 67.

B.  Medication Compliance

Plaintiff alleges that defendants refused to release him from psychiatric
segregation unless he continued to take Amantadine.  Plaintiff has no right to remain in or return
to general population; defendants' insistence that in order to be released from psychiatric
segregation plaintiff continue to take medications he claims were prescribed to treat his mental
illness does not violate plaintiff's constitutional rights.  Sandin v. Connor, 515 U.S. 472, 480
(1995).

C.  Other Matters

Plaintiff also alleges that defendants Downing, Johnson, Paizis and Moghaddas,
and especially defendants Johnson and Paizis, retaliated against him for filing Lamon v. Pliler,
03-423 FCD CMK P.  He identifies defendant Johnson as one of the "John Doe" defendants in
that action.  He further alleges that as part of their retaliatory actions, defendants have
misdiagnosed plaintiff as delusional and have repeatedly returned him to B Facility where they
knew generally that mentally ill inmates should not be housed and specifically that plaintiff was
in danger.  Opp'n at 12 ¶¶ 31-33.  These claims were not part of the amended complaint.

1   Plaintiff cannot use his opposition to a motion for summary judgment, filed long after the

2   answers were filed in this case, as a vehicle to further amend his complaint to raise additional

3   claims.  Cowen v. Bank United of Texas, 70 F.3d 937, 944 (7th Cir. 1995).

4   IV.  Defendant Walker

5              As with defendants Johnson, Downing, Paizis and Moghaddas, plaintiff attempts

6   to expand the allegations of the complaint against defendant Walker to include claims that

7   Walker retaliated by having plaintiff placed in Ad Seg and by placing him on B Facility, even

8   though an inmate with mental health concerns should not be placed there and because of the

9   limited programming available to inmates on B Facility.  See, e.g., Opp'n at 2 ¶ 2 (B Facility is

10  used to house incorrigible inmates and inmates with mental problems are not routinely housed

11  there); id. at 8 ¶ 19 (Walker had plaintiff moved from C to B Facility).  The court will not

12  consider these new claims at this stage in the litigation.

13             Defendant Walker was the Facility Captain for A Facility from January 1999

14  through September 2003 and served as the acting Associate Warden for B Facility in September

15  2003.  From September 2003 until December 2005 he was an Associate Warden for A Facility

16  and then for healthcare.  MSJ, Ex. A, Declaration of J. Walker (Walker Decl.) ¶ 2.  He avers that

17  he would not and did not enlist gang members to harm plaintiff.  Id. ¶ 3.

18             In March 2003, plaintiff filed a civil rights action against seventeen defendants at

19  California State Prison–Folsom; the action eventually became known as Lamon v. Pliler, Civ.

20  No. S-03-423 FCD CMK.  Opp'n, Ex. 8.

21             On February 24, 2004, plaintiff was placed in a two-man cell with inmate Edward

22  Dale Johnson.  Opp'n at 7-8 ¶ 17.  Plaintiff alleges that defendant Walker engineered the

23  placement and that Johnson is a known associate of the Bloodline prison gang.  Id.  As plaintiff

24  provides no documentary support for either of these claims, nor explains how he knows of

25  Johnson's affiliation or Walker's actions, the court will not consider these two claims.

26  /////

12

On February 19, March 25 and April 18, 2004, plaintiff told prison authorities he had concerns for his safety on B Facility; on other occasions he faked being suicidal and then told mental health personnel that he was in danger on B Facility.  He alleges, but provides no proof, that defendant Walker was aware of his claims.  Opp'n at 5-6 ¶ 12; id. at 7-8 ¶ 17 & Exs. 10 & 11 at 4-6.

On June 10, 2004, Magistrate Judge Drozd issued service documents for ten defendants in Lamon v. Pliler.  Opp'n at 9 ¶ 21 & Ex. 8 (Docket No. 17).  On June 23, 2004, inmate Aaron Patrick Burris was assigned to plaintiff's cell.  Opp'n at 9 ¶ 21.  Plaintiff claims that Burris was a Blood and that the placement was authorized or condoned by defendant Walker, id., but has presented no evidentiary support for these claims nor demonstrated that these claims are within his personal knowledge.  The court will not consider them.

On July 4, 2004, plaintiff was given a Rules Violation Report for refusing to return to his cell and was placed in segregation.  Opp'n at 11 ¶ 29 & Ex. 16.  On July 7, 2004, plaintiff attended an Institutional Classification Committee meeting for review of his placement.  Defendant Walker, who was the chairman of the committee, told plaintiff that "if I back off my allegations of retaliation, he would let me out of the hole and everything would go back to normal."  Depo. of Barry Lamon (Lamon Depo.) at 70:21-24; Opp'n at 11-12 ¶ 30.  Plaintiff refused and was held in administrative segregation.  Opp'n at 11-12 ¶ 30.

/////
/////
/////
/////
/////
/////
////
////

Retaliatory actions taken against a prisoner for exercising his First Amendment rights violate the constitution whether or not the underlying actions would establish a constitutional violation.  Rhodes v. Robinson, 408 F.3d 559, 567-68 (9th Cir. 2005) (footnote omitted).

> Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal.

An allegation of a threat of harm, rather than of actual chill, may be a sufficient basis for a claim of retaliation, as the threat may have a chilling effect.  Brodheim v. Cry, 584 F.3d 1262, 1270 (9th Cir. 2009); Pratt v. Rowland, 65 F.3d 802, 807 (9th Cir. 1995); Valandingham v. Bojorquez, 866 F.2d 1135, 1138 (9th Cir.1989).

In this case, plaintiff has proffered nothing but his own speculation that Walker recruited Bloodline members to harm him, that B Facility is a Bloodline stronghold, that Walker ordered him placed in B Facility, and that Walker ordered him celled with Bloodline members or associates.[3]  Plaintiff has proffered his own testimony that Walker said he would release plaintiff from segregation if he dropped his claims of retaliation, but this does not support a reasonable inference that Walker recruited gang members to kill plaintiff in retaliation for a lawsuit against correctional officials.

As noted above, plaintiff has now attempted to change the focus of his claim against Walker to that of a failure to protect: he claims he made his fears known to Walker, who did not remove him from B Facility.  But, as noted above, the court does not countenance plaintiff's attempt to reformulate his complaint at this stage of the litigation.  To the extent that

---

[3]  In his deposition, plaintiff said that Walker had distributed a pound of crystal meth to the Bloodline as payment for an attack on plaintiff, but that Bloodline members told him and did not carry out the attack.  Lamon Depo. at 14:9-15.  This is hearsay, which the court will not consider.

1   any failure to protect claim is based on Walker's alleged recruitment of Bloodline members to

2   kill plaintiff, it founders on plaintiff's complete failure to present any admissible evidence of

3   such a plan.  Walker is entitled to summary judgment.

4   V.  Defendants Parks, Lorusso and Ellis

5           The three claims against defendants Parks, Lorrusso and Ellis revolve around

6   interactions with plaintiff as they provided food to or attempted to retrieve food trays from

7   plaintiff.  Meal trays are provided through a food port, which is an opening in a cell door perhaps

8   fourteen inches long and three inches high.  Lamon Depo. at 10:1-2.  A correctional officer opens

9   the port from the outside by unlocking it and pulling a lever, which allows the port to swing

10  outward on a hinge.   Lamon Depo. at 10:5-9.

11          A.  Lorusso

12          Between November 21 and December 20, 2004, plaintiff sent a number of letters

13  to the courts, the Warden, the Inspector General and the Attorney General's office, complaining

14  about the behavior of defendants Parks, Lorusso and other staff.  Opp'n at 19 ¶ 58.  On

15  December 20, he mailed two "appeals of complaints" against the defendants and a request for an

16  extension of time to file an opposition to a motion to dismiss in the 2003 case referenced above,

17  Lamon v. Pliler.  Id.  Lorusso handled plaintiff's outgoing mail, but was unaware that plaintiff

18  was mailing complaints or grievances.  See Mot. to Compel (Docket No. 94; Lorusso's

19  Interrogatory Responses) at 26 ¶ 19.

20          On December 22, 2004, defendant Lorusso opened plaintiff's food port and

21  provided a tray of food.  MSJ, Ex. F, Declaration of D. Lorusso (Lorusso Decl.) ¶ 3.  According

22  to Lorusso, plaintiff thrust his right arm out of the food port and struck Lorusso in the groin.  Id.

23  ¶ 4.  According to plaintiff, he put his bent arm sideways across the food port because Lorusso

24  had given him only a third of the usual ration.  Opp'n at 19-20 ¶¶ 55, 60.  Plaintiff and Lorusso

25  agree that plaintiff asked to see a sergeant.  Lorusso Decl. ¶ 5; Opp'n at 19 ¶ 55.

26  /////

1    According to Lorusso, plaintiff refused to remove his arm from the food port,

2  even when Lorusso gave him a direct order to do so.  Lorusso Decl. ¶¶ 4-6.  According to

3  plaintiff, Lorusso gave no orders or made no other comments and in fact kicked the food port

4  shut, trapping plaintiff's arm.  Opp'n at 20 ¶ 60.[4]  Lorusso then used pepper spray while saying,

5  "I've been waiting for your ass."  Id.

6    Lorusso avers that he administered two bursts of pepper spray, each a second

7  long, only after issuing several more orders to plaintiff.  Lorusso Decl. ¶¶ 7-8.  The spray struck

8  plaintiff in the face.  Id. ¶ 8.

9    Plaintiff says there was an immediate infliction of pain and an ongoing infliction

10  of pain as the residue of the pepper spray was reactivated by water over the following two weeks.

11  Lamon Depo. at 59:21-25, 60:1-2.

12    B.  Parks

13    On November 15, 2004, plaintiff put a series of documents to be filed in Lamon v.

14  Pliler, the 2003 case, in the outgoing mail.  Opp'n at 15 ¶ 41.  A day later, he found his

15  opposition to a motion to dismiss shoved under the door of his cell.  Id. ¶ 42.  He attempted to

16  mail it twice more.  Id. at 16 ¶ 43.[5]

17  /////

---

18

19    [4] Plaintiff says this contention is supported by the declaration of Kyle Avery, which was
    attached to his original complaint.  Defendants suggest that the court may not consider this

20  declaration because the original complaint has been superseded by the second amended
    complaint.  Reply at 9.  Both parties are wrong.  Although the court may consider any document

21  in the record on summary judgment, plaintiff did not attach Avery's declaration to his original
    complaint; he provided declarations from inmates Ellington, Wright, Simpson, Wilson,

    Livingston, Hunter and Parks.  Martinez v. Stanford, 323 F.3d 1178, 1184 (9th Cir. 2003).

22  Respondent also claims it is improper for plaintiff to claim that Lorusso kicked the food port shut
    at this point in the litigation.  Plaintiff's argument now with respect to Lorusso, however, is not

23  like plaintiff's attempts to expand the claims against defendants Walker, Downing, Johnson,
    Moghaddas and Paizis, but rather is a more complete description of the incident alleged in

24  summary fashion in the second amended complaint.

25    [5] Plaintiff alleges that defendants Parks, Lorusso and Ellis and their co-workers "kept
    returning" the opposition to plaintiff.  Opp'n at 16 ¶ 43.  The court will not credit this conclusory

26  claim.

On November 21, 2004, Parks put plaintiff's evening food tray in his food slot. MSJ, Ex. D, Declaration of T. Parks (Parks Decl.) ¶ 3; Opp'n at 16 ¶ 44. According to Parks, plaintiff attempted to grab Parks; according to plaintiff, he did not attempt to have any contact with Parks. Opp'n at 16 ¶ 45.

The parties agree that plaintiff ejected the tray from his food port, but Parks characterizes the ejection as plaintiff's attempt to throw food at him while plaintiff contends he merely pushed the tray back out of the slot and onto the ground. Parks Decl. ¶ 5; Opp'n at 16 ¶ 44. Inmate Hall, two cells away, did not hear Parks issue any orders. Opp'n, Ex. 28, Hall Decl. ¶ 5. According to Parks, he administered a single two second burst of pepper spray through the food slot to prevent plaintiff from throwing food. Parks Decl. ¶ 5. According to plaintiff, Parks "used at least three times that much spray," which hit plaintiff's back and the back of his head. Opp'n at 17-18 ¶¶ 49-50.

Parks contends that plaintiff tried to retreat to the back of his cell as Parks utilized the pepper spray; according to plaintiff, he had gone to the rear of his cell to retrieve some ramen from his locker before Parks used the spray. Opp'n at 16 ¶ 44, Ex. 21 at 56.

The medical evaluation showed that plaintiff had a small area of redness on his neck after the incident. MSJ, Ex. E. According to plaintiff, however, the spray remained in his hair and leached out, burning him anew, every time he bathed or sweated during the subsequent seven days. Opp'n at 18 ¶ 51; Lamon Depo. at 59:21-25, 60:1-2.[6]

C. Ellis

On September 7, 2005, plaintiff sought to make copies of a number of declarations from inmates who wanted to testify against Ellis and his co-workers. Opp'n at 26 ¶ 80.

/////

---

[6] As noted above, plaintiff may describe his symptoms, as he is doing here, but may not diagnose. See note 2 supra.

1          Also on September 7, 2005, when Ellis delivered plaintiff's dinner, plaintiff told

2     him he would not return the tray to Ellis until a sergeant could see it.  Lamon Depo. at 16:2-4.

3     When Ellis returned for the tray, plaintiff refused to surrender it.  MSJ, Ex. H, Declaration of L.

4     Ellis (Ellis Decl.) ¶ 3; Opp'n at 23 ¶¶ 69, 71.  Ellis asked, but did not order, plaintiff to return the

5     tray.  Lamon Depo. at 16:13, 19:16-20.  Both agree that Ellis then left to collect other trays.  Ellis

6     Decl. ¶ 4; Opp'n at 24 ¶ 71.  According to plaintiff, however, before Ellis left, he saturated

7     plaintiff with pepper spray, causing plaintiff to take refuge under a tent made of his blanket.

8     Opp'n at 24 ¶ 71.  The spray hit plaintiff on the back of his head, on the nape of his neck and

9     between his shoulder blades, and his cell was saturated.  Lamon Depo. at 17:13-16; Opp'n at 25

10    ¶ 75.

11         According to Ellis, when he returned, plaintiff asked to speak to a sergeant and

12    agreed to cuff up when Ellis said the sergeant was in his office.  Ellis Decl. ¶¶ 4-5.  Plaintiff put

13    his right arm through the food port and refused to remove it even when Ellis ordered him to do

14    so.  Id. ¶ 6.  It was only then that Ellis used pepper spray until he felt it was safe to enter

15    plaintiff's cell.  Id. ¶ 8.

16         Plaintiff avers he did not put his arm through the food port and in fact did not

17    move from his refuge under his blankets even when Ellis said that the sergeant was in his office.

18    Opp'n at 24 ¶¶ 72-73.  In plaintiff's account, he did not get out from under his blanket until

19    Lieutenant Brown came to his cell door.  Id. at 24-25 ¶¶ 74-75; Lamon Depo. at 18:23-25.

20         When plaintiff was taken to see the nurse, the spray was burning his skin.  Lamon

21    Depo. at 24:11.  The pain returned for a period of time thereafter when he showered.  Id. at 27:6-

22    8.

23         D.  Retaliation

24         Plaintiff has not shown that there is a disputed issue of material fact to maintain

25    his claim that defendants Parks, Lorusso and Ellis used pepper spray in retaliation for his

26    complaints to the courts and the inspector general or for the 2003 lawsuit, Lamon v. Pliler.

1  Plaintiff has presented nothing showing that these defendants were aware of his litigation or of

2  the contents of the letters that Lorusso collected.  Plaintiff's attempt to tie these defendants to the

3  return of his opposition to the motion to dismiss in Lamon v. Pliler falls short, as he avers that

4  these defendants and their co-workers returned his opposition twice, without making any attempt

5  to explain how the defendants plus an unnamed number of their colleagues could have twice

6  returned a document.  Plaintiff's conclusory allegation will not defeat summary judgment.

7  Federal Trade Commission v. Publishing Clearing House, Inc., 104 F.3d 1168, 1171 (9th Cir.

8  1997).  Similarly, plaintiff has utterly failed to tie his attempts to make copies of inmate

9  declarations on the morning of September 7, 2005, to Ellis's use of pepper spray after dinner that

10  evening.  Accordingly, he has failed to show there is any disputed issue of material fact on the

11  question whether the acts of which he complains were undertaken because of his protected

12  conduct.

13     E.  Excessive Use Of Force

14         In considering an Eighth Amendment claim of excessive force, a court must give

15  deference to the quick decisions officers must make when responding to a confrontation with

16  "riotous inmates."  Whitley v. Albers, 475 U.S. 312, 320-22 (1986).  A deferential standard

17  applies even in the case of "a lesser disruption," so long as it is necessary for guards to use force

18  to keep order.  Hudson v. McMillian, 503 U.S. 1, 6 (1992).  In the case of resistance, the

19  determinative question is "whether force was applied in a good faith effort to maintain or restore

20  discipline or maliciously and sadistically for the purpose of causing harm."  Id. at 7.  The use of

21  pepper spray implicates the excessive use of force in the Eighth Amendment context.  Fogarty v.

22  Gallegos, 523 F.3d 1147, 1160 (10th Cir. 2008); Clement v. Gomez, 298 F.3d 898, 903-04 (9th

23  Cir. 2002).

24         The Ninth Circuit has relied on the Hudson factors in determining whether an

25  officer's application of force was undertaken in a good faith effort to restore discipline or

26  maliciously and sadistically to cause harm.  Martinez v. Stanford, 323 F.3d 1178, 1184 (9th Cir.

2003).  These factors are: 1) the extent of the injury suffered by an inmate; 2) the need for application of force; 3) the relationship between that need and the amount of force used; 4) the threat reasonably perceived by the responsible officials; and 5) any efforts made to temper the severity of a forceful response.  Id.

An Eighth Amendment violation may be established even in the absence of significant injury.  Hudson, 503 U.S. at 9.  "When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated."  Id.  Although the deprivation, meaning the use of force,[7] must be more than de minimis, one court has found that an unjustified use of pepper spray was excessive within the meaning of the Eighth Amendment even when the injury was "not of great significance."  Foulk v. Charrier, 262 F.3d 687, 701 (8th Cir. 2001).

In Treats v. Morgan, 308 F.3d 868 (8th Cir. 2002), the court considered the use of pepper spray against an inmate who refused a guard's direction that he take his copy of a particular form.  According to the inmate's affidavit submitted in opposition to summary judgment, he refused to take the form and left the office, but the guard followed him, demanded that he take the form and, when he again refused, used pepper spray against him without warning. Id. at 870.  The Court of Appeals upheld the district court's rejection of the guard's claim of qualified immunity:

> Not every instance of inmate resistance justifies the use of force, and the use of pepper spray will not be justified every time an inmate questions orders or seeks redress for an officer's actions. The test is whether the officer's use of force was reasonable under the circumstances, or whether it was punitive, arbitrary, or malicious.  A basis for an Eighth Amendment claim exists when, as alleged here, an officer uses pepper spray without warning on an inmate who may have questioned his actions but who otherwise poses no threat.

Id. at 872-73.  The court also noted that "no lasting injury is necessary to make out an Eighth

[7] The Ninth Circuit has recognized that the Hudson standard focuses on the nature of the force used.  Oliver v. Keller, 289 F.3d 623, 628 (9th Cir. 2002).

1   Amendment violation, for the infliction of pain is sufficient if it was inflicted for the purpose of

2   causing harm." Id. at 874.

3           The Eighth Circuit, in Walker v. Bowersox, 526 F.3d 1186 (8th Cir. 2008), also

4   considered the use of pepper spray against an inmate who refused a guard's order to surrender a

5   food tray and found the district court had erred in granting the guard's motion for summary

6   judgment:

7           While Knarr attested that he used pepper spray because Walker
            was disrupting the unit routine and distracting officers, and that
8           trays could be used as weapons, it was undisputed that Walker was
            in his cell at the time of the incident, and that although he refused
9           three orders to give Knarr his cell mate's tray and refused to move
            away from the food port, Knarr gave no warning before first
10          spraying around the port–with a super-soaker used for riot
            situations–and Walker was moving away from the port when Knarr
11          sprayed him a second time directly in the face and soaked the entire
            cell and bedding with spray . . . .

12

13   Id. at 1189; Thomas v. Northern, 574 F.Supp.2d 1029 (E.D. Mo. 2008) (summary judgment not

14   appropriate when guards used pepper spray against inmate who took food port hostage; court

15   could not find inmate posed threat when officials had taken no action for four hours).

16          On this claim in this case, there are disputed issues of material fact that preclude

17   summary judgment for defendants Parks, Lorusso and Ellis.  The evidence is in dispute over

18   whether plaintiff struck Lorusso or even had his arm out of the food port when Lorusso used the

19   spray; plaintiff claims that Lorusso had already kicked the food port closed, which dislodged

20   plaintiff's arm.  Accordingly, it is disputed whether plaintiff constituted a threat to institutional

21   security at the time Lorusso administered the spray.  Moreover, according to plaintiff, Lorusso

22   said, "I've been waiting for your ass" as he administered the spray, which suggests, if plaintiff's

23   testimony is believed, that the spray was administered for the purpose of causing harm.  Finally,

24   while defendant Lorusso suggests the harm was de minimis, plaintiff described the ongoing,

25   burning sensation produced by the spray, a sufficient injury to preclude summary judgment.

26   /////

1      While it is a closer case for defendant Parks, because plaintiff acknowledges that

2  he pushed his tray out of the food port onto the floor, plaintiff avers he had gone to the back of

3  his cell and was taking no further action when Parks sprayed him without warning.  Parks

4  contends instead he used the spray only to prevent plaintiff from throwing more food.  The

5  evidence is thus in dispute over whether Parks used the spray to restore order or neutralize a

6  threat, or in a punitive fashion.

7      Finally, Ellis does not suggest that plaintiff's retention of the tray posed a threat to

8  institutional security or explain why plaintiff's refusal to remove his arm from the food port was

9  deemed a threatening gesture.  Even if Ellis had so explained, the evidence is disputed whether

10 plaintiff in fact put his arm through the port or simply refused to return the dinner tray.

11 Moreover, even if the court assumes that Ellis had shown plaintiff's actions to be threatening,

12 there is a disputed issue as to the response to the perceived threat that the court cannot resolve on

13 summary judgment: according to plaintiff, his cell was saturated with spray, while Ellis claims to

14 have used only two blasts of one-second each.

15     F.  Qualified Immunity

16     Parks, Lorusso and Ellis also contend they are entitled to rely on the doctrine of

17 qualified immunity.

18     Government officials performing discretionary functions generally are shielded

19 from liability for civil damages insofar as their conduct does not violate clearly established

20 statutory or constitutional rights of which a reasonable person would have known.  Harlow v.

21 Fitzgerald, 457 U.S. 800, 818 (1982).  In determining whether a governmental officer is immune

22 from suit based on the doctrine of qualified immunity, the court considers two questions.  One is,

23 taken in the light most favorable to the party asserting the injury, do the facts alleged show the

24 officer's conduct violated a constitutional right?  Saucier v. Katz, 533 U.S. 194, 201 (2001).  A

25 negative answer ends the analysis, with qualified immunity protecting defendant from liability.

26 Id.  If a constitutional violation occurred, a court also inquires "whether the right was clearly

1  established." Id. "If the law did not put the [defendant] on notice that [his] conduct would be

2  clearly unlawful, summary judgment based on qualified immunity is appropriate." Id. at 202.

3  The district court may decide the order of addressing these questions and answer only the second,

4  in accordance with fairness and efficiency and in light of the circumstances of a particular case.

5  Pearson v. Callahan, __ U.S. __, 129 S.Ct. 808, 821-22 (2009). In this case, the court finds no

6  reason to dispense with the familiar Saucier analysis.

7       As noted above, there are disputed issues of material fact on the question of these

8  three defendants' use of force against plaintiff. As the Eighth Circuit has observed:

> By June of 1994, the law was well established that a malicious and
> sadistic use of force by a prison official against a prisoner, done
> with the intent to injure and causing actual injury, is enough to
> establish a violation of the Eighth Amendment's cruel and unusual
> punishment clause.

12  Foulk, 262 F.3d at 702. In this case, it was similarly clearly established in 2004 and 2005 that

13  the malicious use of pepper spray or the unreasonable response to a perceived threat violated the

14  Eighth Amendment. See Hudson, 503 U.S. at 9; Clement v. Gomez, 298 F.3d at 903. These

15  defendants are not entitled to qualified immunity.

16       Accordingly, IT IS ORDERED that plaintiff's motion to file an opposition longer

17  than twenty-five pages (docket no. 190) is granted.

18       IT IS HEREBY RECOMMENDED that defendants' motion for summary

19  judgment (docket no. 152) be decided as follows:

20       1. Granted as to defendants Walker, Downing, Johnson, Moghaddas and Paizis in

21  all respects;

22       2. Granted as to the claim that defendants Ellis, Lorusso and Parks retaliated

23  against plaintiff; and

24       3. Denied as to the claim that defendants Ellis, Lorusso and Parks violated

25  plaintiff's Eighth Amendment rights.

26  /////

1    These findings and recommendations are submitted to the United States District

2  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-

3  one days after being served with these findings and recommendations, any party may file written

4  objections with the court and serve a copy on all parties.  Such a document should be captioned

5  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

6  shall be served and filed within seven days after service of the objections.  The parties are

7  advised that failure to file objections within the specified time may waive the right to appeal the

8  District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).  **If a party does not**

9  **plan to file objections or a reply that party is encouraged to file a prompt notice informing**

10  **the court of as much**.

11  DATED:  September 1, 2010.

14  U.S. MAGISTRATE JUDGE

25  2

26  lamo0156.57